# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

VERNIE WHITE, et al.,

              Plaintiffs,

v                                         NO. CV-10-08128-PCT-JRG

UNITED STATES OF AMERICA,

              Defendant.

## MEMORANDUM OPINION AND ORDER

On January 17, 2012, the court conducted a bench trial in this action.   On March 5, 2012, the United States submitted its Proposed Findings of Fact [Docket 115].   On March 15, 2012, the plaintiff submitted its Proposed Findings of Fact and Conclusions of Law [Docket 116].   Having considered the pleadings, the testimony of witnesses, the documents in evidence, and the supplemental post-trial memoranda, the court makes its Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I.    FINDINGS OF FACT

The following discussion represents the court's findings of fact as to liability.   Each finding is made by a preponderance of the evidence.

### A.  The Accident

This case arises out of injuries the minor plaintiffs, Rolynn White and Roland White Jr., sustained in a school bus accident on May 19, 2009.   The plaintiffs allege that the accident occurred as a result of the negligence of the bus driver, Glenn Thomas Tate.

The parties stipulate that the Cibecue Community Education Board retained Glenn Thomas Tate to drive a school bus for Cibecue Community School ("CCS"), and that he was in fact driving the school bus when it was involved in a single vehicle accident on May 19, 2009.  (Proposed Findings of Fact of the United States [Docket 115].)   I **FIND** that at the time of the accident, the school bus was traveling northbound on State Route 73 near milepost 328.9.  (Arizona Traffic Accident Report, Pl.'s Ex. 24.)   I **FIND** that the bus drifted to the right and exited the roadway.  (*Id.*)   I **FIND** that the bus then travelled down an embankment, striking two large tree branches and a large steel culvert.   (*Id.*)   I **FIND** that the bus then vaulted a small wash and came to rest with the front end against a large tree.   (*Id.*)    I **FIND** that at the time of the accident, nine students and Tate were on board the bus, including Roland White Jr. and Rolynn White.   (*Id.*)   Following the accident, Tate was interviewed inside a WMAT ambulance.   (*Id.*)   When asked what caused the collision, Tate stated that he blacked out while he was driving.   (Arizona Traffic Accident Report, Pl.'s Ex. 24.)

I **FIND** that when the accident occurred, Rolynn White was sleeping and listening to music on the bus on her way home from school at CCS.   (Trial Tr. 103:8-108:2.)   I **FIND** that the bus did not have seat belts.   (*Id.*)   Rolynn testified that she was awakened when she felt the ride become bumpy.   (*Id.*)   She grabbed a hold of the seat and felt herself fly forward.   (*Id.*)   The next thing she remembers is waking up on the floor of the bus to stabbing pains, which were 10 out of 10 on a pain scale.   (*Id.*)   After that, she remembers being in the hospital in Phoenix.   (*Id.*)

Roland White also testified that he was sleeping at the time of the accident and woke up when the bus exited the roadway.   (Trial Tr. 78:20-84:21.)   His last memory of the accident is

when the bus hit the tree.   (*Id.*)   He testified that he woke up in the local hospital, with his jaw and hip in the worst pain he could imagine.   (*Id.*)

### B.  Violation of Arizona Traffic Statutes

Accident Reconstructionist Patrick DeJonghe testified regarding the dynamics of the bus accident.   (Trial Tr. 59:21-61:14.)   DeJonghe was tendered as an expert in accident reconstruction.   (Trial Tr. 58:15-59:17).   Defense counsel questioned DeJonghe regarding his qualifications, and made no objection to his admission as an expert in the field of accident reconstruction.   (Trial Tr. 58:11-59:17.)   DeJonghe testified that the accident occurred on a two-lane roadway.   The road at the location of the accident is "extremely straight."   (Trial Tr. 59:23-24.)   DeJonghe testified that the accident occurred when the bus "simply veered off of the roadway at a very slight angle in the neighborhood of about four degrees."   (Trial Tr. 59:25-60:5.)   The bus then "got off into the serious decline of the roadway in which it went faster."   (*Id.*)   Finally, the bus "struck culverts and a tree and came to a stop."   (*Id.*)

DeJonghe testified that following the accident, the school bus was inspected and found to be mechanically sound.   (Trial Tr. 60: 6-7.)   Additionally, DeJonghe testified that the roadway was in excellent condition at the time of the accident.   (Trial Tr. 60:8-10.)   Specifically, he testified the roadway had no flaws, no ruts or holes, and was well painted.   (*Id.*)   Based on DeJonghe's testimony and the accident report entered into evidence, the court **FINDS** that the school bus was mechanically sound at the time of the accident.   The court **FINDS** that the roadway was in good or better condition at the time the accident occurred.   Additionally, the court **FINDS** that no evidence has been presented to suggest that the accident was the result of mechanical malfunction or road conditions.

DeJonghe testified that veering off the roadway and into a tree is a violation of two Arizona safety standards.   (Trial Tr. 60:11-18.)   First, it is a violation of A.R.S. § 28-701, which requires a driver to control the speed of his vehicle and not strike objects adjacent to the roadway.   (*Id.*) Second, it is a violation of § 28-729, which prohibits a driver from changing lanes or moving out of a lane until the movement can be made safely.   (*Id.*)   Based on the violation of these statutes, DeJonghe opined that the driver of the school bus involved in this accident was negligent.   (Trial Tr. 60:19-20.)

DeJonghe also testified regarding the Federal Motor Carrier Safety regulations and the rules adopted by the State of Arizona at R-17, Chapter 9.   (Trial Tr. 60:24-61:14.)   Specifically, DeJonghe stated that these regulations prohibit a person who is ill, sick, or fatigued from operating a commercial motor vehicle.   (*Id.*)   He stated that, in his opinion, a driver whose medical records include a history of vomiting, headaches, dizziness, and possible fainting would be violating regulations including 49 CFR § 392.3 by driving a school bus.   (*Id.*)

## II.     FINDINGS CONCERNING EVIDENCE AND WITNESS CREDIBILITY

The following witnesses provided uncontroverted testimony for the plaintiffs at trial.   The defendant did not present any witnesses.

### A.  Vernie White

Vernie White is the mother of Roland Jr. and Rolynn White.   She is also a plaintiff in this case.   Ms. White testified regarding her knowledge of the events that occurred on May 19, 2009. She also testified regarding the impact of Rolynn and Roland Jr.'s injuries on their daily activities and on their family.   The court credits Ms. White's testimony as it relates to these events and has

relied on it both for background information and to place exhibits in context.   I **FIND** that Ms. White appeared sincere and forthright, and her testimony was not contradicted in the record.

### B.  Dr. Martha Miller

Dr. Martha Miller is a board-certified diplomat in internal medicine.   (Trial Tr. 48:7-12, 49:4-11.)   The parties stipulated to Dr. Miller's expertise in general and internal medicine.   (Trial Tr. 49:17-50:2.)   Dr. Miller testified regarding Glenn Thomas Tate's medical records.   I **FIND** that Dr. Miller appeared knowledgeable and forthright, and her testimony was not contradicted in the record.   The court credits her testimony and has relied on it both for background information and to place exhibits in context.

### C.  Patrick DeJonghe

Patrick DeJonghe testified regarding the dynamics of the bus accident.   (Trial Tr. 59:21-61:14.)   DeJonghe is an accident reconstructionist.   He was tendered as an expert in accident reconstruction.   (Trial Tr. 58:15-59:17).   Defense counsel questioned DeJonghe regarding his qualifications, and made no objection to his admission as an expert in the field of accident reconstruction.   (Trial Tr. 58:11-59:17.)

I **FIND** that Mr. DeJonghe appeared knowledgeable, candid, and truthful.   The court credits Mr. DeJonghe's testimony regarding the dynamics of the accident and has relied on it for background and to place exhibits in context.

The court does not credit Mr. DeJonghe's statement regarding whether Mr. Tate was supervised by CCS.   When asked, "[I]s it your conclusion or among your conclusions that Mr. Tate was not closely supervised by the—his employers at Cibecue Community School?", DeJonghe replied "Correct."   The defendant has offered this statement as evidence that Mr. Tate

was an independent contractor rather than an employee.   However, DeJonghe's statement was made in the context of discussing the circumstances that led up to the bus accident itself.   The court does not understand this statement to relate in any way to the employment relationship between Tate and CCS.   DeJonghe was hired to investigate the bus accident and has no expert knowledge of Tate's employment status.   For these reasons, the court **FINDS** that DeJonghe's statement has little probative value.

### III.       CONCLUSIONS OF LAW

#### A.  Subject Matter Jurisdiction

For the reasons discussed below, the court **FINDS** that it has subject matter jurisdiction over this matter pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80.   The FTCA is the exclusive legal remedy for claims against the United States for damages based on "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."   28 U.S.C. § 1346(b)(1).

The parties stipulate that Cibecue Community School ("CCS") is a grant school pursuant to the Tribally Controlled Schools Act, P.L. 101-512, codified at 25 U.S.C. § 450f, Historical and Statutory Notes.   (Proposed Final Pretrial Order [Docket 84], at 3.)   The parties further stipulate that persons found to be employees of Cibecue Community Education Board, Inc., and whose services are paid for with federal grant monies are federal employees for purposes of the Federal Tort Claims Act.   (*Id.*)

I **FIND** that CCS is a K-12 school that was originally operated as a Bureau of Indian Affairs School, but is now operated as a grant school funded from the Bureau. (Santiago Dep., 58:19-60:4.) The school serves approximately 500 students. (*Id.*) CCS provides transportation for children to and from school by operating school buses on a daily basis. (Pls.' Ex. 49, CCS' Student Transportation Policy; Dep. Ervin Quay, 122:10-19.) I **FIND** that CCS' transportation costs are funded through a federal grant from the Bureau of Indian Affairs. (Pls. Ex. 46, Tribally Controlled School Grant Conditions; Dep. Santiago, 58:19-60:4, 88:15-20.)

### a. Relationship between Glenn Thomas Tate and CCS

As set forth below, the court **FINDS** that Glenn Thomas Tate was an employee of CCS for purposes of the FTCA.

As an initial matter, the United States admitted in its Answer to the Amended Complaint that Tate was an employee of CCS. (Answer [Docket 12], a 2-3 ("Defendant admits that the bus was driven by Glenn Thomas Tate, an employee of Cibecue Community School.").) This answer was filed on October 26, 2010. The United States maintained its position on Tate's status as an employee of CCS for nearly a year, and well past the Scheduling Order's deadline for amending the pleadings in this case. On November 10, 2011, over a year after the answer was filed and eight months after the deadline to amend its pleadings under the Scheduling Order, the defendant inexplicably changed its position on the issue of Tate's status as an employee and filed a motion for leave to amend its Answer. The defendant provided the court with no explanation for its sudden change of position and did not offer any evidence to show that it had been diligent in attempting to comply with the amendment deadline in the Scheduling Order. Because the defendant failed to demonstrate good cause to amend the scheduling order, its motion to amend its

Answer was denied.   Therefore, the court **CONCLUDES** that the defendant has made a valid admission that Tate was an employee of CCS.

Even if the defendant had not admitted that Tate was an employee of CCS, the court **FINDS** that a preponderance of the evidence establishes that Tate was an employee of CCS.

Whether an individual is a federal employee for purposes of the FTCA is a question of federal law.  *Autery v. United States*, 424 F.3d 944, 957 (2005).   Common law agency principles are also instructive.  *Id.*   "The critical test for distinguishing an agent from a contractor is the existence of federal authority to control and supervise the 'detailed physical performance' and 'day-to-day operations' of the contractor, and not whether the agent must comply with federal standards and regulations."  *Ducey v. United States*, 713 F.2d 504, 516 (9th Cir. 1983) (citing *United States v. Orleans*, 425 U.S. 807, 814–15 (1976)).

The Ninth Circuit has applied the factors from the Restatement (Second) of Agency to determine whether an individual is an employee or an independent contractor.   These factors include:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> (d) the skill required in the particular occupation;
>
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
>
> (f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

*Slage v. United States*, 612 F.2d 1157, 1160 (9th Cir. 1980) (quoting RESTATEMENT (SECOND) OF AGENCY, § 220(2) (1958)).   Other factors that have been considered by the Ninth Circuit include: whether an individual receives a fixed salary on a regular basis; whether he is subject to tax deductions; whether he "can refuse the call for assistance"; and whether he is "required to be available at a particular time."   *Id.* at 1160.   An individual may be an employee for one purpose and an independent contractor for another.   *Carnation Co. v. NLRB*, 429 F.2d 1130, 1134 (9th Cir. 1970).

The government has offered two primary arguments in support of is assertion that Tate was an independent contractor.   First, the government points to the way that Tate was retained and the way his pay was handled within CCS.   The government points out that Tate was retained by the Cibecue Community Education Board pursuant to the terms of a document entitled "Contracted Services Agreement."   (Def.'s Exs. 100, 103).   The court **FINDS**, however, that Tate did not sign the document.   (*Id.*)   The court also **FINDS** that the document includes a line for the payee's social security number, which was left blank.   (*Id.*)   The Contracted Services Agreement states: "As the payee, I understand that I am contracted to perform only the services stipulated above, and that I will perform these services as an independent contractor, not an employee of the school . . . ."   (*Id.*)   The document further provides that Tate would not be covered by workers' compensation, retirement, social security, or other benefits.   (*Id.*)   Tate is identified on the

- 9 -

document as the "payee."  (*Id.*)  The Contracted Services Agreement was signed by the superintendent, a representative of the business office, and a representative of the school board, and was approved by the Cibecue Community Education Board.  (Def.'s Ex. 103.)  Ervin Quay testified that he received a copy of the Contracted Services Agreement and delivered it to Tate. (Quay Dep. 79:2-79:9.)    However, Tate's signature on the agreement was not obtained.  (*Id.*)

Irvin Santiago, CCS director of school support services, testified in his deposition that the Contracted Services Agreement was a form of documentation required by the CCS business office to confirm that the CCS' Board had approved the person to work.  (Santiago Dep. 19:17-22; 93:5-16.)  Santiago testified that CCS sometimes used the Contracted Services Agreement to avoid the requirement that a job be advertised and posted for more than thirty days.  (Santiago Dep. 101:8-20.)  CCS used this same agreement for probationary employees.  (Santiago Dep. 91:24-92:6.)  Santiago testified that the same form that was used for Tate was used for independent contractors.  However, independent contractors were required to sign the form. (Santiago Dep. 83:1-18.)  The court **FINDS** that Tate was not required to and did not sign the Contracted Service Agreement.   (Def.'s Ex. 100, Contracted Service Agreement.)

Under the terms of the Contracted Services Agreement, Tate was not eligible to receive health insurance benefits, retirement benefits, paid vacation leave, or paid sick leave.   (Def.'s Ex. 100; Tate Dep. 101:16-102:9.)   Additionally, Tate did not have federal income taxes, state income taxes, or social security taxes withheld from his pay.  (Tate. Dep. 101:16-102:9; 103:21-23.) Tate received a 1099 Form rather than a W-2.  (Def.'s Ex. 101.)  The 1099 Form indicates that he received "non-employee compensation."  (*Id.*; Tate Dep. 103:13-104:21.)  Tate was paid by CCS through the use of Purchase Orders and Purchase Requisitions.  (Def.'s Ex. 102; Quay Dep.

96:14-17.)   Meanwhile, other bus drivers were paid using the regular payroll system.   (Quay Dep. 95:19-96:17; Santiago Dep. 76:20-77:4.)   Santiago testified, however, that CCS was mistaken in its tax treatment of Tate and others.   Santiago further testified that, following a 2010 audit, individuals like Tate have been reclassified as employees for tax purposes.   Based on these statements in the record, the court **FINDS** that CCS' admitted error and the fact that Tate was paid with purchase orders are relevant but not dispositive.   *See United States v. Becker*, 378 F.2d 319, 322 (1967) (finding employee status for a pilot who was paid using a voucher system and whose salary was not subject to deductions for benefits and taxes).

Next, the government argues that CCS did not maintain a substantial level of control over Tate's day-to-day responsibilities as a bus driver.   In determining whether an individual is an employee or independent contractor, the most important factor to consider is the extent of control the master exercises over the details of the individual's work.   *See Ducey v. United States*, 713 F.2d 504, 516 (9th Cir. 1983) (citing *Orleans*, 425 U.S. at 814–15) ("The critical test for distinguishing an agent from a contractor is the existence of federal authority to control and supervise the 'detailed physical performance' and 'day-to-day operations' of the contractor.").

The United States maintains that CCS had a minimal amount of control over the details of Tate's work.   Specifically, the government has argued that Tate's discretion over basic driving decisions—when to turn the steering wheel, how fast to accelerate, and when to brake—establishes that he is an independent contractor.   The court is not persuaded by this argument.   The court does not accept that a bus driver is never an employee unless he is provided with the type of step-by-step instruction and supervision normally found only in a new driver's education course.   Rather, the court understands Tate's discretion over basic driving decisions to

be a necessary and inherent part of any bus driver's job.   *Cf.* RESTATEMENT § 220, cmt. D ("Thus, the full-time cook is regarded as a servant although it is understood that the employer will exercise no control over the cooking.").

I **FIND** that Tate filled out an "Application for Employment" with CCS on August 23, 2007.   (Pls.' Ex. 47, Application for Employment).   I **FIND** that on the application, Tate applied for the position "bus driver."   (*Id.*)   Quay testified that Tate was looking for a job as a bus driver because the previous school he had worked for had shut down.   (Quay Dep. 13:21-24.)   I **FIND** that Tate did not own a school bus company; rather, he was simply looking for a job driving the school bus.   (Tate Dep. 82:24-83:1; Quay Dep. 25:24-26:4.)   I **FIND** that at the time Tate applied for the job, CCS was urgently looking for an additional bus driver.   (Quay Dep. 13:13-14:1.) Ervin Quay testified in his deposition that he knew Tate was looking for a job and understood that Tate wished to be a CCS employee and bus driver.   (Quay Dep. 29:21-30:9.)   I **FIND** that Tate was hired to fill a bus driver position.   (Quay Dep. 38:8-10.)   I **FIND** that in October 2007, Tate began driving the school bus for CCS.   (Tate Dep. 31:20-22.)   I **FIND** that CCS Director of School Support Services Irvin Santiago considered Tate to be an employee of CCS.   (Santiago Dep. 37:13-18.)   Additionally, I **FIND** that Tate considered himself to be an employee.   (Tate Dep. 82:17-20.)

I **FIND** that Tate received at least $87,257 in workers compensation benefits for medical bills and time missed from work.   (Pls.' Ex. 48, Loss History; Tate Dep. 70:1-16.)   In Arizona, workers compensation must be paid to employees, but is not required for independent contractors. A.R.S. § 23-902.   CCS has not challenged Tate's status as an employee for workers'

compensation purposes although CCS informed its workers' compensation carrier of the contracted services agreement used by CCS.   (Santiago Dep. 15:3-14; 82:9-15.)

Irvin Santiago testified that Tate worked full time for CCS prior to the accident.   (Santiago Dep. 39:5-14.)   I **FIND** that Tate generally worked forty hours a week.   I **FIND** that Tate was required to record the hours he worked.   I **FIND** that he was paid by the hour, at a rate of $10.00 per hour.   (Pls.' Ex. 57, Time Card; Quay Dep. 14:8-19.)   I **FIND** that other CCS bus drivers were also paid $10.00 per hour.   (Quay Dep. 28:17-19.)   Santiago testified that if Tate worked more than forty hours in a week, he was entitled to time and a half pay due to the Fair Labor Standards Act.   (Santiago Dep. 39:2-14.)   I **FIND** that Tate's hourly wage was paid bi-weekly by CCS.   (Quay Dep. 56:1-22.)   I **FIND** that Tate's wage was paid with federal grant monies. (Santiago Dep. 88:18-20.)   I **FIND** that Tate's hours were set by CCS.   (Santiago Dep. 25:1-4.) I **FIND** that Tate was not allowed to vary the number of hours he worked per day.   I **FIND** that if Tate was unable to work, a CCS supervisor would drive the route in his place.   I **FIND** that Tate was not permitted to subcontract the work.   (Santiago Dep. 25:1-6; Quay Dep. 58:4-21; Tate Dep. 83:6-19.)

I **FIND** that the school bus was leased by the government to CCS.   I **FIND** that Tate did not provide or lease the bus.   (Quay Depo. 15:15-21.)   I **FIND** that CCS paid for gasoline to fuel the bus.   (Quay Dep. 15:24-17:12; Tate Dep. 82:2-8.)   I **FIND** that CCS also paid for insurance for the school bus.   (*Id.*)   I **FIND** that Tate was not required to provide his own liability insurance to drive the school bus.   (*Id.*)   I **FIND** that CCS provided Tate with a cell phone, which CCS paid for.   I **FIND** Tate was once reprimanded for misusing the cell phone and required to reimburse CCS for the improper usage.   (*Id.*; Quay Dep. 23:15-23; 112:25-113:24.)   I **FIND** that CCS

provided the first aid kit, fire extinguisher, and radio on the bus.   (Quay Dep. 25:7-23.)   I **FIND** that CCS arranged and paid for maintenance and repairs of the school bus.   (Quay Dep. 26:25-27:10; 55:13-56:13; Tate Dep. 80:9-13.)   I **FIND** that Tate was not required to maintain or perform any maintenance on the bus.   (Quay Dep. 26:8-24.)   I **FIND** that Tate's compensation was not tied to his performance.   I **FIND** that Tate did not have profit motive in the bus' operation.   (Santiago Dep. 25:23-25.)

I **FIND** that CCS established Tate's route and where the school bus would stop.   (Quay Dep. 18:7-20:25.)   I **FIND** that CCS also decided what time the students would be picked up at the bus stops and when and where the bus would drop them off at school.   (*Id.*)   I **FIND** that if Tate did not comply with the time and location directions he was given by CCS, he could be fired.   (Quay Dep. 21:11-23.)   I **FIND** that Tate was required to check in at CCS when he arrived in the morning.   (Quay Dep. 98:25-99:3.)   I **FIND** that Quay ensured that Tate was on schedule driving the bus both in the morning and in the afternoon.   (Quay Dep. 14:23-15:1.)   I **FIND** that on at least two occasions, Quay rode along with Tate to supervise his driving.   (Quay Dep. 101:19-120:1;120:5-10.)   Quay testified that he did not ride along with Tate more often because the bus route started a long way from the school.   Quay further testified that if there had been complaints about Tate, Quay would have ridden with him more often.   (Quay Dep. 125:13-126:11.)

I **FIND** that Tate was required to follow CCS school policies regarding attire and treatment of students on the bus.   (Quay Dep. 21:1-11; 54:11-55:4.)   I **FIND** that Tate was not permitted to eat on the bus, to wear headphones while driving, or talk on his cell phone while driving the bus.   (Quay Dep. 46:19-49:7.)   I **FIND** that CCS required Tate to perform a daily inspection of the bus

and turn in his inspection report.   (Pls. Ex. 52, Vehicle Inspection Reports; Quay Dep. 35:21-36:6; Tate Dep. 89:6-13.)   I **FIND** that CCS also required Tate to keep track of and report his daily mileage, to clean the bus, and to attend monthly staff meetings.   (Quay Dep. 70:8-24; 105:14-22; 23;24-25:16; Tate Dep. 89:14-18.)   Based on these factors, the court **FINDS** that CCS retained close control of Tate.

I **FIND** a preponderance of the evidence establishes that CCS retained very substantial control over the way Tate carried out his duties.   I **FIND** that Tate was provided with a detailed route he was required to drive each day.   I **FIND** that Tate was required to check in when he arrived at CCS, and his supervisor would make sure that he drove his routes on schedule.   I **FIND** that on two occasions, a supervisor rode with Tate to ensure that he was driving the routes correctly.   I **FIND** that Tate was subject to detailed policies regarding how to interact with students, what to wear, and how to conduct himself while driving the bus.   I **FIND** that Tate was required to report student misbehavior to his supervisor, to perform a daily inspection of the bus, to report his daily mileage, and to attend monthly staff meetings.

For the reasons discussed above, the court **FINDS** and **CONCLUDES** that Tate was an employee of Cibecue Community School at the time of the accident.

I **FIND** that at the time of the accident, Tate was driving the school bus transporting CCS students home after school.   (Tate Dep. 67:22-68:4.)   The defendant has not argued that Tate was outside the scope of his employment at the time of the accident, and the court **CONCLUDES** that any such argument has been waived.   Further, the court **CONCLUDES** that the evidence in the record clearly establishes by a preponderance of the evidence that Tate was within the scope of his employment at the time of the accident.   Therefore, for the reasons set forth above, the court

**FINDS** and **CONCLUDES** that Tate was an employee of CCS acting within the scope of his employment at the time the accident in this case occurred.

### b.  Exhaustion of Administrative Remedies

For the reasons set forth herein, the court **CONCLUDES** that the plaintiffs in this case timely and properly exhausted their administrative remedies.

The parties have stipulated that the administrative claims of Vernie White, Rolynn White, and Roland White Jr. were timely submitted and these plaintiffs properly exhausted their administrative remedies.   (Proposed Final Pretrial Order [Docket 84], at 3.)   Therefore, the court **CONCLUDES** that the administrative remedies of Vernie White, Rolynn White, and Roland White Jr. were timely submitted and have been properly exhausted.

The defendant has argued, however, that Roland White Sr.'s administrative remedies had not been exhausted at the time suit was filed.   A denial of an administrative claim under the FTCA must occur before suit is filed.  *See McNeil v. United States*, 508 U.S. 106 (1993) (finding the FTCA requirement of administrative exhaustion was not satisfied where the plaintiff received a final rejection from the appropriate agency after he had filed suit but before any substantial progress in the litigation had been made).   If an agency has not made a final disposition of a claim within six months, the claimant is entitled to treat "the agency failure to act as a final denial of the claim."   28 U.S.C. § 2675(a); *Canton v. United States*, 495 F.2d 635, 638 (9th Cir. 1974).

In this case, the plaintiffs filed suit on July 22, 2010.   The DOI did not send a written final denial of the plaintiffs' claims until August 16, 2011.   The defendant argues that because Roland White Sr., did not sign the claim forms submitted to the DOI in January, his claims were not properly presented to the agency until March.

- 16 -

I **FIND** that the United States Department of the Interior ("DOI") received Standard Form 95 forms regarding Rolynn White's injuries on January 12, 2010, and regarding Roland White Jr.'s injuries on January 13, 2010.   (Pl.'s Exs. 36 & 36.)   I **FIND** that both claim forms were signed by Vernie White.   (*Id.*)

The requirement that a claimant sign a claim form is not found in the text of the FTCA itself, which requires only that a claimant "shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied" before he is permitted to file suit.   28 U.S.C. § 2675(a).   The signature requirement is found in the regulations accompanying the statute, 28 C.F.R. § 14.2, which states:

> For the purposes of the provisions of 28 U.S.C. 2401(b), 2672, and 2675, a claim shall be deemed to have been presented when a Federal agency receives from the claimant, his duly authorized agent or legal representative, an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident; and the title or legal capacity of the person signing, and is accompanied by evidence of his authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian, or other representative.

*Id.*   Similar instructions are also printed on the claim form itself.

In *Warren v. United States Department of Interior Bureau of Land Management.*, 724 F.2d 776, 778 (9th Cir. 1984), the Ninth Circuit ruled that failure of a claimant's attorney to present extrinsic evidence of his authority to sign a claim form was not a jurisdictional defect.   The court held although Congress gave the Attorney General power to promulgate regulations pursuant to § 2672, such regulations are not jurisdictional requirements under 28 U.S.C. § 2675.   Instead, § 2675 was intended by Congress only to "give agencies sufficient notice to enable them to begin

- 17 -

their own investigations." *Id.* at 779. "Minimal notice requires claimants to (1) give an agency sufficient written notice to commence investigation and (2) place a value on the claim." *Id.* Applying this rule, the court in *Warren* determined that the action of the agency in denying the claim on the merits was "persuasive evidence that the jurisdictional requirement of minimal notice was satisfied." *Id.* Thus, while failure to comply with the regulations could possibly delay or prevent settlement negotiations with the agency, it did not affect the jurisdiction of a court after the claim had been denied.

I **FIND** that sets of claim forms were filed in January 2010, one for claims arising from Roland, Jr.'s injuries, and the other for claims arising from Rolynn White's injuries. I **FIND** that on the first, Roland White Jr., Vernie White, and Roland White Sr., are all listed as claimants, the claim is stated to arise "from personal injuries and damages suffered by Roland White Jr., and his parents, Roland White Sr. and Vernie White, as a result of a May 19, 2009 bus crash, as described in Section 9," and the amount of claim is listed as $125,000 allotted to Roland, Jr., and $125,000 to "Parents." I **FIND** that similarly, the claim form relating to Rolynn White's injuries lists Rolynn White, Vernie White, and Roland White Sr., as claimants, states that the claim "arises from personal injuries and damages suffered by Rolynn White, and her parents, Roland White Sr. and Vernie White," and seeks $2,500,000 for Rolynn White and $600,000 for "Parents." I **FIND** that on both forms, Roland White Sr. is explicitly listed as a claimant and a specific amount is requested for which the agency might settle with both Roland Sr., and Vernie White together as "parents." Based on this information, the court **CONCLUDES** that the DOI was given sufficient written notice in January 2010 to begin investigating Roland White Sr.'s claims and to inform the DOI of a sum certain amount for which those claims might be settled. *See Warren*, 724 F.2d at

779 (stating that the exhaustion requirement of the FTCA was intended to give agencies minimal notice to begin investigating the claims); *see also Mader v. United States*, 654 F.3d 794, 809–810 (8th Cir. 2011) (Bye, J., dissenting) (observing that "the judicial consensus is that section 2675 mandates only 'minimal notice'"). Therefore, the court **CONCLUDES** that the claims of all plaintiffs, including Roland White Sr., were presented to the DOI as required by 28 U.S.C. § 2675(a), and **CONCLUDES** that these claims are properly before the court. (*See* Order [Docket 82], at 7.)

For the reasons discussed above, the court **CONCLUDES** that subject matter jurisdiction over this matter is proper pursuant to the FTCA.

## B. Tate's Negligence

To establish a claim for negligence under Arizona law, a plaintiff must prove:   1) a duty requiring the defendant to conform to a certain standard of care; 2) a breach by the defendant of that standard; 3) a causal connection between the defendant's breach and the resulting injury; and 4) actual damages. *Gipson v. Kasey*, 214 Ariz. 141, 143 (2007) (citing *Ontiveros v. Borak*, 136 Ariz. 500, 504 (1983)).

I **FIND** that on May 19, 2009, a CCS school bus driven by Tate was involved in a single-vehicle accident. (Pl.'s Ex. 24.)   I **FIND** that the bus exited the roadway and fell down and embankment. (*Id.*)   I **FIND** that Rolynn White and Roland White Jr. were injured in the accident. (*Id.*)

Arizona follows the doctrine of negligence per se. Pursuant to that doctrine, the "breach of a statute intended as a safety regulation is not merely evidence of negligence but is negligence *per se*." *Brannigan v. Raybuck*, 136 Ariz. 513, 517 (1983). "In Arizona, violation of a statute

establishes the elements of duty and breach, requiring the plaintiff to prove only proximate cause and damages." *Resolution Trust Corp. v. Dean*, 854 F.Supp. 626, 640 (1994). Arizona's traffic code is a safety regulation that can be the basis for negligence per se. *City of Phx. v. Mullen*, 65 Ariz. 83, 86 (1946) (""[I]f the proximate cause of an injury to another is the failure of the driver of the vehicle to comply with the positive directions of the statute relating to the operation of motor vehicles, such failure or violation is negligence per se and actionable negligence."). Arizona traffic statutes affirmatively required Tate to control the school bus so as to keep it within the lane on the right side of the highway. A.R.S. § 28-721; (Trial Tr. 60:11-23.) Tate was required to prevent the bus from moving out of the lane until the movement could be made safely. A.R.S. § 28-729; (Trial Tr. 60:11-23.) I **FIND** that Tate failed to control the school bus, and **CONCLUDE** that Tate violated A.R.S. § 28-729 when he failed to prevent the bus from exiting the lane he was driving in and veering off the roadway.

Arizona law permits a defendant to avoid the effects of the negligence per se doctrine in some circumstances if the defendant can prove that a driver's failure to comply with the traffic code resulted from a legally recognized excuse. One such excuse is the "sudden incapacity" defense. *Goodrich v. Blair*, 132 Ariz. 459, 461 (1982). The sudden incapacity defense focuses on the defendant's decision to drive at all. *Id.* Therefore, "[i]f the defendant's health was such that a reasonably prudent man would not risk driving a car, then the defendant is negligent by merely undertaking the task of driving . . . . If, on the other hand, a person is not negligent in choosing to drive his car, then he is not negligent when he loses control of that car due to a heart attack." *Id.* The focus of the sudden incapacity defense is on whether the physical incapacity was reasonably foreseeable. *Id.*

In this case, I **FIND** that the defendant withdrew the sudden incapacity defense prior to trial.   (Pretrial Order [Docket 84], at 4.)   Consistent with this withdrawal, the defendant did not present any evidence or witnesses at trial to support a sudden incapacity defense.   The court therefore **CONCLUDES** that the defendant did not properly assert or maintain a sudden incapacity defense.   Even if the defendant had presented such a defense, I **CONCLUDE** that it would not have been successful because I **FIND** that Tate's sudden incapacity was reasonably foreseeable in light of his medical history.

Based on the evidence set forth below, I **FIND** that Tate had a history of diabetes, dizziness, headaches, sensitivity to light, and fainting spells, which pre-dated the May 2009 accident.   (Pls.' Exs. 28, 54, 62;   Tate Dep. 19:14-16, 20:19-21:10, 35:17-38:8, 42:2-53:1.)   I **FIND** that prior to the accident, Tate had expressed concern about driving a school bus in light of his health conditions.   (Tate Dep. 26:19-27:14, 42:19-24)   I **FIND** that at one point, following a discussion with doctors, Tate stopped driving the school bus due to his health condition.   (Tate Dep. 41:8-43:8.)   I **FIND** that Tate has stated that he is supposed to keep his blood sugars around 110-120.   (Tate. Dep. 43:9-10.)   I **FIND** that Tate has further stated that if his blood sugars reach the 200s, he has headaches and feels "weird" or "strange."   (Tate Dep. 43:12-44:2.)

I **FIND** that in the summer of 2008, Tate applied for Social Security disability because he had been told he should not drive a school bus.   (Tape Dep. 55: 5-22.)   I **FIND** that on August 19, 2008, Tate had a medical examination by the DOT.   I **FIND** that on his health history form for this application, Tate made several material misrepresentations.   For example, when asked whether he had had any illness or injury in the past five years, he checked no.   In his deposition, Tate admitted that these statements were false.   (Tate Dep. 26:19-27:4; 42:19-24.)

The plaintiffs presented the testimony of Dr. Martha Miller, M.D., who is a board-certified diplomat in internal medicine.   (Trial Tr. 48:7-12, 49:4-11.)   The parties stipulated to Dr. Miller's expertise in general and internal medicine.   (Trial Tr. 49:17-50:2.)

According to the testimony of Dr. Miller, in the year prior to the accident, Tate experienced multiple syncopal episodes in which he either lost consciousness or felt very faint and had to lie down.   (Trial Tr. 51:25-53:2.)   These incidents included episodes of visual changes and dizziness.   In response to these episodes, Tate reported that he would sometimes check his sugars and find them to be low.   He told his doctors that he sometimes drank a regular soda when this occurred.   Dr. Miller further testified that in May 2008, Tate was instructed not to drive until he was cleared to do so.   (Trial Tr. 53:7-12.)   This instruction was given based on his syncopal episodes.   (*Id.*)

Dr. Miller testified that, according to Tate's medical records, Tate had a long history of reporting feelings of dizziness due to low blood sugars.   Dr. Miller testified that Tate's records reflected that he had reported drinking regular soda in an attempt to bring up his blood sugars. The records further reflected that Tate's nutritionist and doctors told him he should not do this because of the risk of rebound hyperglycemia followed by hypoglycemia as his body tries to compensate.   (Trial Tr. 53:21-54:2.)   She testified that, based on Tate's records, he woke on the day of the accident with a headache and feeling strange, so he drank a soda pop.   (Trial Tr. 54: 4-8.)   Based upon her review of Tate's medical records, Dr. Miller opined that a reasonable person in Tate's shoes on the day of the accident would have recognized that he was not in any condition to drive.   (Trial Tr. 55:11-14.)

Based on these facts, the court **FINDS** that Tate's decision to drive the school bus, given his medical history, was negligent.  Further, the court **CONCLUDES** that Tate's violation of safety statues was negligence per se and **FINDS** that Tate has provided no explanation or excuse for permitting the bus to veer off the side of the road.  *See, e.g.*, *Matthews v. Greyhound Lines, Inc.*, 882 F.Supp. 146 (D. Ariz. 1995).   The court **FINDS** that Tate's negligence was the direct cause and proximate cause of the bus accident that took place on May 19, 2009.  The court **FINDS** that the injuries Rolynn and Roland White Jr. sustained in the May 19 accident were the direct and proximate result of Tate's negligence.

### C.  Liability of the United States

The FTCA is the exclusive legal remedy for claims against the United States for damages based on "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."   28 U.S.C. § 1346(b)(1).

The parties stipulate that Cibecue Community School ("CCS") is a grant school pursuant to the Tribally Controlled Schools Act, P.L. 101-512, codified at 25 U.S.C. § 450f, Historical and Statutory Notes.   (Proposed Final Pretrial Order [Docket 84], at 3.)   The parties further stipulate that persons found to be employees of Cibecue Community Education Board, Inc., and whose services are paid for with federal grant monies are federal employees for purposes of the Federal Tort Claims Act.   (*Id.*)   CCS provides transportation for children to and from school by operating school buses on a daily basis.  (Pls.' Ex. 49, CCS' Student Transportation Policy; Dep. Ervin

Quay, 122:10-19.)   CCS' transportation costs are funded through a federal grant from the Bureau of Indian Affairs.   (Pls. Ex. 46, Tribally Controlled School Grant Conditions; Dep. Santiago, 58:19-60:4, 88:15-20.)

For the reasons discussed above, the court has found that Tate is an employee of CCS and that he was acting in the scope of his employment at the time of the accident.   The court has also found that the plaintiffs suffered personal injury as a result of Tate's negligence.   The court therefore **CONCLUDES** that the circumstances of the accident in this case are such that a private person "would be liable to the claimant in accordance with the law of the place where the act or omission occurred."   28 U.S.C. § 1346(b)(1).   Therefore, the court **CONCLUDES** that the United States is liable to the plaintiffs for the personal injuries sustained by Rolynn White and Roland White Jr.

### D.  Damages

For the reasons discussed herein, I **FIND** that each plaintiff is entitled to an amount of money that will reasonably and fairly compensate him or her for each of the following elements of damages proved by the evidence to have resulted from the defendant's fault:

a.  The nature, extent, and duration of the injury;

b.  The pain, discomfort, suffering, disability, disfigurement, and anxiety already experienced, and reasonably probable to be experienced in the future as a result of the injury;

c.  Reasonable expenses of necessary medical care, treatment, and services rendered, and reasonably probable to be incurred in the future;

d.  Lost earnings to date, and any decrease in earning power or capacity in the future;

    e.  Loss of love, care, affection, companionship, and other pleasures of the family relationship;

    f.  Loss of enjoyment of life, that is, the participation in life's activities to the quality and extent normally enjoyed before the injury.

Revised Arizona Jury Instructions (RAJI (Civil) 4th), Personal Injury Damages 1, Measure of Damage.

### 1.  Rolynn White

Dr. Marjorie Eskay-Auerbach, a board-certified expert in orthopedics with a specialty in spinal injuries, testified by videotaped deposition regarding Rolynn White's injuries.   The parties stipulated to Dr. Eskay-Auerbach's expertise in orthopedic injuries.   (Eskay-Auerbach Dep. 8:1-11.)   Dr. Eskay-Auerbach reviewed Rolynn's medical records and examined her. (Eskay-Auerbach Dep. 8:17-9:1.)

I **FIND** that as a result of the May 2009 accident, Rolynn White suffered multiple injuries including, but not limited to a dislocated elbow, a burst fracture at L-2, a fracture of the sacrum, and pelvic hematomas.   (Eskay-Auerbach Dep. 14:10-15:4.)   I **FIND** that as a result of these injuries, Rolynn has a 12% permanent impairment of her person related to her spinal injury and a 3% impairment of her person as a result of her elbow injury.   Thus, I **FIND** that Rolynn has a total 15% impairment of her whole person as a result of the accident.   (Pl.'s Ex. 3, 6; Eskay-Auerbach Dep. 27:11-30:10.)   I **FIND** that Rolynn underwent two surgeries on her elbow, a closed reduction of the coccyx, and a lumbar fusion.   (Eskay-Auerbach Dep. , 15:5-15.)

I **FIND** that doctors were initially able to pop Rolynn's dislocated elbow back into place and put her in a brace.  I **FIND** that the elbow popped back out and damaged her collateral ligament.   I **FIND** that as a result, the elbow required an additional surgery and Rolynn had to be

placed in an external fixator.   (Pls.' Ex. 10; Eskay-Auerbach Dep. 15:20-17:11.)   I **FIND** that in August 2009, Rolynn underwent general anesthesia in order to have the external fixator removed from her elbow.   (Trial Tr. 40:10-13.)

I **FIND** that Rolynn also suffered a burst injury to her L-3 vertabae in her back.   (Ex. 11; Eskay-Auerbach Dep. 17:12-18:23.)   I **FIND** that as a result of this injury, Rolynn underwent an open reduction, internal fixation of the fracture, along with bone grafting to repair the fracture. (Eskay-Auerbach Dep. 19:10-20:14.)   I **FIND** that Rolynn's entire lumbar spine, L1-L5, was fused.   (Pl.'s Ex. 3, at 3-4.)   I **FIND** that the hardware from the procedures remains in Rolynn's spine.   (Eskay-Auerbach Dep. 20:15-20.)   I **FIND** that Rolynn's injuries were very painful and that some of the pain was excruciating.   (Eskay-Auerbach Dep. 31:21-32:13.)   Dr. Eskay-Auerbach's IME report indicates that Rolynn will continue to have chronic back and elbow pain.   (Pl.'s Ex. 6.)

Rolynn also testified regarding her injuries.   She stated that she continues to suffer from pain in her tailbone, which requires her to often use a pillow when sitting.   (Trial Tr. 112:14-113:3.)   Both her elbow and her back cause her pain and limit her activities on a daily basis.   (Trial Tr. 41:19-15, 113:4-116:17.)   Rolynn testified that she is concerned about her future due to her injuries.   (Trial Tr. 40:23-41:14; 117:22-118:3.)   Prior to the accident, she was able to enjoy playing basketball and participating in other sports and outdoor activities.   (Trial Tr. 4!:15-18; 117:3-8.)   Due to her injuries sustained in the bus accident, Rolynn stated that she can no longer play basketball.   She also cannot ride a horse, an activity she previously enjoyed. (Trial Tr. 46:6-15; 116:24-117:2.)

The parties stipulate that Rolynn White's medical providers billed $386,944.46 for accident-related medical care provided to her.   (Proposed Final Pretrial Order [Docket 84], at 3; *see also* Pl.'s Exs. 12-13(h).)   The parties further stipulate that the Arizona Health Care Cost Containment System Administration (AHCCCS) paid $82,652.38, and the federal share totaled $65,455.57.   (*Id.*)

### a.   Reasonableness of Medical Bills

The defendant argues that the plaintiffs failed to prove the necessity of the medical services rendered and the reasonableness of the medical expenses charged for medical services rendered to Rolynn White.   The plaintiffs offered the testimony of Dr. Eskay-Auerbach to support the reasonableness and necessity of the past medical mills.   The defendants argue that Dr. Eskay-Auerbach's testimony on this issue should be excluded because her opinion was not properly disclosed.   The plaintiffs admit that they did not explicitly disclose Dr. Eskay-Auerbach's opinions regarding the reasonableness and necessity of Rolynn's past medical bills.   However, they argue that her opinion was implicit in the disclosure of her expert report. Further, they assert that even if the court finds Dr. Eskay-Auerbach's opinion on this issue was not properly disclosed, the failure was harmless under Federal Rule of Civil Procedure 37(c)(1).

Having fully considered the argument of each parties, the court **CONCLUDES** that the plaintiffs failed to properly disclose Dr. Eskay-Auerbach's opinion on the issue of the reasonableness of the medical bills.   The court further **CONCLUDES**, however, that this failure was harmless under Rule 37(c)(1).   The plaintiffs had previously disclosed that they were claiming the full, reasonable amount of the billed medical charges for Rolynn White's care. Additionally, counsel for the United States was able to cross-examine Dr. Eskay-Auerbach on this

issue at deposition.   (Eskay-Auerbach Dep. 59:23-61:6.)   Accordingly, the court **FINDS** that the plaintiffs' failure to disclose Dr. Eskay-Auerbach's opinion on the reasonableness of medical bills was harmless.   The court will therefore consider Dr. Eskay-Auerbach's testimony on this issue.

Furthermore, the court **CONCLUDES** that Dr. Eskay-Auerbach's testimony on the reasonableness of the medical bills is not essential to a finding that the medical bills were reasonable in this case.   *See W. Gas Const. Co. v. Danner*, 97 F. 882, 887 (9th Cir. 1899) ("The reasonableness of the charge in such cases does not solely depend upon the testimony of experts, although such testimony is proper, and entitled to weight, and is usually given as an aid to the jury in determining the proper amount to be allowed; but the jury have the right, in this connection, to consider the character and extent of the plaintiff's injury, and extent and character of the medical services and treatment to be received, and from all the evidence to determine the amount that should be given.").   The plaintiffs have provided expert testimony as to the reasonableness and necessity of the care provided to Rolynn and Roland White Jr., the medical bills are itemized and were submitted into evidence, and there is no contention that the medical care provided was unnecessary.   The court therefore **FINDS** that expert testimony regarding the reasonableness of the medical charges was not required in this specific case and **FINDS** that the medical charges of $386,944.46 are reasonable.   The court further **FINDS** that the United States is entitled to an offset of $65,455.57, the amount that the parties have stipulated to be the federal share of the AHCCCS payment.

### b.  Future Medical Bills and General Damages

In addition to testimony regarding the reasonableness of Rolynn's past medical bills, Dr. Eskay-Auerbach testified regarding the future care Rolynn is likely to require as a result of the

accident.   Economic consultant John Buehler, Ph.D., provided an estimated present value of the cost of this care.   The defendant has not offered any evidence or witnesses to contradict the testimony of Dr. Eskay-Auerbach and Dr. Buehler.

I **FIND** that Rolynn White has a life expectancy of approximately 61 additional years. (Trial Tr. 152:2-15.)   Dr. Eskay-Auerbach opined to a reasonable degree of medical certainty that Rolynn will have chronic low back pain as a result of the extensive surgery she underwent due to the accident.   (Pl.'s Ex. 4.)   Due to this pain, Dr. Eskay-Auerbach opined that Rolynn likely will need 10-12 physical therapy visits each year, at a cost of $125.00 per visit.   The court credits this testimony and **FINDS** that the cost of Rolynn's White's future physical therapy is $85,250.   (Pl.'s Exs. 4, 39, 39a; Eskay-Auerbach Dep. 25:8-10.)   Because physical therapy is a human service, the court **FINDS** that no reduction for present value is necessary.   (Trial Tr. 154:7-17.)

Dr. Eskay-Auerbach testified that she anticipates Rolynn will have chronic low back pain which may require formal pain management with a pain management specialist.   (Pl.'s Ex. 4.) The government offered no evidence or testimony to rebut Dr. Eskay-Auerbach's testimony and opinions.

Dr. Eskay-Auerbach opined that a pain specialist is likely to recommend pain medications on a long-term basis.   She testified that Rolynn "may have occasional episodes where she'll require some short-term medications stronger than nonsteroidal anti-inflammatories." (Eskay-Auerbach Dep. 65:4-66:6.)   I **FIND** that the retail cost of narcotic pain medications is $2500 per month.   Having fully considered the testimony and evidence, the court **CONCLUDES** that there is insufficient evidence to find that Rolynn's damages include the cost of chronic narcotic pain medications.

Dr. Eskay-Auerbach opined that it is more likely than not that that Rolynn will need an annual course of epidural steroid injections beginning in her mid-thirties.   (Eskay-Auerbach Dep. 63:25-65:3.)   The government has not offered any evidence or testimony to contradict Dr. Eskay-Auerbach's assessment of the need for or the cost of epidural steroid injections.   I **FIND** that Rolynn will require epidural steroid injections.   I **FIND** that the cost of these injections is $1500 per injection.   Dr. Eskay-Auerbach stated that she believes Rolynn may require three to four injections per year for back and leg pain.   Dr. Buehler calculated that the present value of these injections is $117,230 for three injections per year, or $156,306 for four injections per year. (Pl.'s Ex. 39(a).)   The court **FINDS** that this calculation is correct.   Based on the evidence before the court, the court **FINDS** that Rolynn White's damages include the future cost of three epidural steroid injections per year beginning in 2027.

Additionally, Dr. Eskay-Auerbach testified that due to increased wear and tear on the joints above and below Rolynn's spine, there is a 30% chance that Rolynn will need a lumbar fusion at T12 and L5-S1 in the future.   She testified that the cost of a lumbar fusion is between $50,000 to $70,000.   The court has considered the evidence at Dr. Eskay-Auerbach's testimony and **FINDS** that there is insufficient evidence to establish a reasonable medical probability that Rolynn will require the lumbar fusion.   The court therefore **CONCLUDES** that the cost of the lumbar fusion is not within Rolynn's damages.

The court accepts the uncontroverted testimony of witnesses detailing the pain, suffering, and disability that Rolynn White has suffered as a result of the accident caused by the defendant's negligence.

### c.  Total Damages

Having fully considered the evidence and the testimony of all the witnesses presented, the court **FINDS** that Rolynn White has sustained total damages in the amount of $2,500,000, and **AWARDS** her the same from the defendant.

### 2. Roland White Jr.

I **FIND** that as a result of the accident, Roland White Jr. sustained medical bills totaling $74,076.89.  (Pls.' Exs. 30-34.)   The parties stipulate that medical providers billed AHCCCS $50,274.20 for accident-related medical care provided to Roland Jr.  (Proposed Final Pretrial Order [Docket 84], at 3.)   The parties further stipulate that AHCCCS paid $9,884.92 and the federal share totaled $8,224.50.   (*Id.*)

Dr. Bruce Davis is a board-certified general and trauma surgeon. (Davis Dep., 6:8-11.) The parties stipulated to Dr. Davis's expertise in general and trauma surgery.  (*Id.*)  Dr. Davis testified that he was the trauma surgeon on duty at the trauma center on the day that Roland White Jr. came in.  (Davis Dep. 6:24-8:10.)   He testified that Roland reported a brief loss of consciousness, pain in the left hip and left jaw, and abrasions.  (*Id.*)  He further testified that Roland was awake, alert, oriented, and able to communicate with doctors.  (*Id.*)  I **FIND** that Roland was admitted to the trauma center and stayed there until May 22, 2009.  (Davis Dep. 8:7-9.)   Dr. Davis testified that given his level of injury, the services provided to Roland both at the trauma center and en route to the trauma center were reasonable and necessary.  (Davis Dep. 9:6-21.)   I **FIND** that the services provided to Roland at the trauma center were reasonable and necessary.   Additionally, I **FIND** that the transportation services provided to Roland following the accident were reasonable and necessary given the injuries he sustained and the distance involved in the transport.  (*Id.*)

Having reviewed the evidence, the court **FINDS** that as a result of the bus accident, Roland Jr. suffered a loss of consciousness, abrasions, a cut to the back of his head that required seven staples, a mild pulmonary contusion, a fracture of his mandible (the lower jaw), a fracture in the rami of his pelvis, and a non-displaced sacral fracture.   (Davis Dep. 7:7-12; 18-25; 8:13-17.)   I **FIND** that due to the pulmonary contusion, Roland coughed up blood for approximately a week. (Trial Tr. 91:16-25.)

Dr. Nish Shah, M.D., D.D.S., is a board-certified physician and dentist in oral and maxillofacial surgery.   (Shah Dep. 5:10-22.)   The parties stipulated to Dr. Shah's expertise in oral and maxillofacial surgery.   (Shah Dep. 6:6-9.)   Dr. Shah testified that as a result of the bus accident, Roland suffered a fracture to the left sub-condylar portion of his mandible jaw.   (Shah Dep. 7:19-8:3; Pl.'s Ex. 20.)   I **FIND** that the jaw fracture was caused by the bus accident.   (Pl.'s Ex. 19; Shah Dep. 8:15-9:1.)   I **FIND** that jaw fracture was treated with a closed reduction which involved wiring Roland's jaw shut in order to stabilize the fracture.   (Pl.'s Ex. 21; Shah Dep. 10:19-12:7-22.)   Dr. Shah testified that if this reduction had not been performed, Mr. White could have suffered a malunion, malocclusion, or nonunion of the fracture.   (Shah Dep. 12:23-13:12.) I **FIND** that following the surgery, Roland was required to follow a liquid diet with activity restrictions, pain control, and a preventative course of antibiotics.   (Shah Dep. 13:20-14:13.)   I **FIND** that Roland later returned for a follow-up visit, at which time one of his wires had to be replaced and Roland was prescribed additional pain medication.   (Shah Dep. 15:25-16:15; 27:10-22.)

I **FIND** Roland had to remain on a liquid diet until June 26, 2009.   I **FIND** that on that date, the vertical wires were removed and he was able to slowly begin eating a normal diet once he

regained enough mobility in his jaw to permit him to do so.   (Shah Dep. 17:12-18:12.)   I **FIND** that the remaining wires were not removed until July 27, 2009.   (Shah Dep. 18:23-19:14.)

Dr. Shah testified that in the future, Roland may develop temporomandibular joint problems due to the fracture of his lower jaw.   (Shah Dep. 22:9-12.)   Dr. Shah further testified that the care he provided to Roland was reasonable and necessary, and that his charges for the services provided were reasonable.   (Shah Dep. 23:11-23.)   I **FIND** that the care Roland received for his jaw injury was reasonable and necessary and that the amount billed for this care was reasonable.

Having reviewed the uncontroverted testimony and evidence offered by the plaintiffs, I **FIND** that Roland White's past medical bills totaled $50,274.20.   (Stipulation, Proposed Final Pretrial Order [Docket 84], at 3.)   I **FIND** that this amount was reasonable for the necessary and reasonable care provided.   I further **FIND** that the defendant is entitled to an offset of $8,224.50 for the federal share of this amount paid to AHCCCS.

In addition to his past medical bills, the plaintiffs presented testimony regarding the impact of Roland's injuries on his quality of life.   Prior to the accident, Roland enjoyed hunting, fishing, and caring for his horse.   (Trial Tr. 74:19-75:3-16.)   He also participated in football, softball, and baseball, and contributed to the household by performing chores like chopping wood.   (*Id.*)   As a result of the accident, Roland's ability to help the family with household chores was decreased. (Trial Tr. 89:7-9.)   I **FIND** that during the summer of 2009, Roland was unable to participate in certain Apache dances due to the injuries he sustained in the accident.   (Trial Tr. 95:24-97:3.)   I **FIND** that when he returned to school in the fall of 2009, he had difficulty walking up the stairs

and getting on the school bus.   (Trial Tr. 94:24-95:20.)   I **FIND** that Roland continues to have

scars on his head and knees as a result of the accident.   (Trial Tr. 92:15-93:5.)

The court accepts the uncontroverted testimony detailing the pain, suffering, and injuries

sustained by Roland White Jr. as a result of the accident caused by the defendant's negligence.

Having fully considered all of the evidence and testimony presented, the court **FINDS** Roland

White Jr.'s full damages to be $225,000 and **AWARDS** him the same in judgment against the

defendant.

### 3. Vernie White

I **FIND** that Vernie White is the mother of Rolynn White and Roland White Jr.   (Trial Tr.

15:12-14.)   Under Arizona law, a parent is permitted to assert a claim for loss of consortium based

on an injury to a child.   *Miller v. Westcor Ltd. P'ship*, 171 Ariz. 387, 393-95 (1991).

Vernie White testified that on May 19, 2009, she was waiting for her children's school bus

to arrive.   The bus was late, and Vernie became alarmed.   She then observed emergency response

vehicles driving in the direction from which the bus normally travelled.   Vernie followed the

vehicles to the accident scene.   At the scene, she had to wait approximately an hour before she

was able to see her children.   (Trial Tr. 15:12-19:11.)

Vernie stated that she eventually found Roland in the ambulance where he was

complaining about pain in his jaw and hip.   She then found Rolynn in another ambulance.   At

this time, Rolynn was crying and in pain.   Vernie testified that she tried to comfort Rolynn. (Trial

Tr. 18:7-21:17.)   She learned that Rolynn would be taken to a hospital in Phoenix by helicopter.

Vernie wanted to go with her daughter in the helicopter but was told there was no room for her.

(Trial Tr. 21:18-22:19.)

Vernie testified that she then went to the local hospital to find Roland.   After arriving at the hospital, she learned that Roland was also going to be sent to Phoenix.   She was able to arrange for both Roland and Rolynn to be at the same hospital.   She then went with her son on the air transport to the Phoenix area.   After arriving at the hospital in Phoenix, Vernie went back and forth between hospital rooms in order to be with both of her children.   (Trial Tr. 23:17-26:20.)

Vernie testified regarding the stress and worry she experienced while Rolynn was undergoing an eight-hour back surgery.   Additionally, she testified that for months after the surgery she had to provide constant care for Rolynn.   In total, she spent twenty-two nights at facilities in the Phoenix area in order to be with Rolynn.   She also testified that she tried to calm Roland as he was very frustrated by the limitations he experienced as a result of having his jaw wired shut.   (Trial Tr. 27:6-31:23.)

Based on these facts, the court **FINDS** that Vernie White has suffered a loss of the relationship with her children due to their injuries and due to the anxiety, worry, and stress she experienced on the day of the accident and while caring for her children's injuries.   The court **FINDS** Vernie White's full damages to be $30,000 and awards her the same in judgment against the defendant.

### 4.   Roland White Sr.

Roland White Sr. is the father of Rolynn White and Roland White Jr.   (Trial Tr. 120:12-15.)   Roland Sr. testified that he worries a great deal about Rolynn's future due to her injuries.   Additionally, he stated that he has not been able to hunt and fish with his son as frequently as he did prior to the accident.   Roland Sr. testified that sports and Apache dances are important parts of his relationship with his children.   He has therefore suffered harm as a result of

the injuries to his children.   (Trial Tr. 120:22-132:10.)     The court **FINDS** Roland Sr.'s damages to be $30,000 and **AWARDS** him the same in judgment against the defendant.

## IV.     JUDGMENT

For the foregoing reasons, the court hereby **ORDERS** that **judgment be entered** in favor of the plaintiffs, Vernie White, Roland White Sr., Rolynn White, and Rolland White Jr., against the defendant, United States of America.   The court further **ORDERS** that the plaintiffs are **AWARDED** judgment in the following amounts:   (1) Vernie White is awarded **$30,000** in damages; (2) Roland White Sr. is awarded **$30,000** in damages; (3) Rolynn White is awarded **$2,500,000** in damages, including past medical bills and the cost of future medical care; and (4) Roland White Jr. is awarded **$225,000**, in damages, including past medical bills, for a **total judgment of $2,785,000**.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        July 5, 2012

Joseph R. Goodwin, Chief Judge

- 36 -